Joseph W. JOHNSON, Jr. and Margaret A. Johnson, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

H. Clay Evans JOHNSON and Betty Mead Johnson, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

David F. S. JOHNSON and Elsie E. Johnson, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nos. 73-1908—73-1910.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 12, 1974.

Decided April 9, 1974.

------◆------

Thomas Caldwell, Jr., Chattanooga, Tenn., for appellants; Thomas O. Helton. William C. Myers, Jr., Stophel, Caldwell & Heggie, Chattanooga, Tenn., on brief.

Donald H. Olson, Tax Div., Dept. of Justice, for appellee; Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Jonathan S. Cohen, Attys. Tax Div., Dept. of Justice, Washington, D. C., on brief.

Before CELEBREZZE, PECK and ENGEL, Circuit Judges.

CELEBREZZE, Circuit Judge.

This case presents the question of a donor's income tax liability upon the transfer to a trust of highly appreciated stock subject to debt, where the proceeds of a loan which the stock secures are received by the donor and a large portion of the proceeds is used to pay the donor's gift taxes on the transfer.

Joseph W. Johnson, David F. S. Johnson, and H. Clay Evans Johnson [1] developed Interstate Life and Accident Insurance Company into a successful enterprise. In March 1965, each taxpayer decided to give a substantial block of Interstate stock to his children. Dr. Joseph Johnson's transactions will be described herein, as the prototype for what all three taxpayers did, with figures rounded off for purposes of simplification. [2]

On March 9, 1965, Dr. Johnson obtained $200,000 from a bank by signing a note. The note was secured by 50,000 shares of Interstate stock, "without personal liability" of Dr. Johnson. On March 11, he established an irrevocable trust for his children's benefit and transferred to it his rights in the 50,000 shares. His wife and the lending bank were appointed trustees.

On April 8, the trustees executed a note which cancelled Dr. Johnson's note and opened a $200,000 debit account in the trust's name, with the 50,000 shares pledged as collateral.

When these transactions were completed, Dr. Johnson had $200,000 in cash, and the trust had stock worth over $500,000, encumbered by a $200,000 note. Dr. Johnson later paid gift taxes of $150,000, leaving him $50,000 of cash and no obligation on the note.

I. The Johnsons' wives are parties to the litigation because joint returns were filed in each case.

2. The Tax Court's Opinion, reported at 59 T.C. 791 (1973), describes the transactions in great detail.
The actual figures are as follows:

| | Fair Market Value of Stock Transf'd without debt | Basis of Stock Before Transfer | Loan Taken Out | Gift Tax Paid (State and Federal) | Capital Gain Asserted |
|---|---|---|---|---|---|
| Joseph Johnson | in excess of $500,000 | $10,812.50 | $200,000 | $147,072.51 | $189,187.50 |
| David Johnson | in excess of $500,000 | $10,812.50 | $200,000 | $125,177 | $189,187.50 |
| Clay Johnson | in excess of $500,000 | $10,812.50 | $175,000 | $125,550 | $164,187.50 |

Taxpayers concede on appeal that they have realized a capital gain equal to the excess of the loan proceeds not used to pay their gift taxes over basis. Thus, the only disputed deficiencies on appeal are those on capital gains equal to the amount of gift taxes paid by each taxpayer.

On August 13, 1969, the Commissioner of Internal Revenue mailed deficiency notices to the taxpayers, asserting that each had realized long-term capital gain in the amount that the loan proceeds exceeded the basis in the stock transferred ($200,000 minus $10,000). Taxpayers contested the deficiencies in the Tax Court, arguing that because the transfer of stock to the trust constituted a "net gift," they "realized" no income upon the transfer.

The Tax Court rejected this argument, relying instead on "the *Crane* doctrine"—in broad terms, that the shedding of a liability constitutes the realization of income within § 1001, Int.Rev. Code of 1954. To reach this result, the Tax Court felt it necessary to decide whether the transfers of Interstate stock to the trusts were "in part sales and in part gifts" or "merely gifts of the difference between the fair market value of the stock transferred and the loans to which the stock was subject." 59 T.C. at 806. The Tax Court concluded,

> "We hold that the transfers in question constituted in part a gift and in part a sale. To the extent that the fair market value of the stock transferred by each of the petitioners exceeded the amount of his loan it was a gift subject only to the payment by him of the gift taxes thereon, which have been paid and are not an issue herein. To the extent the transfers were subject to the loans they were sales and petitioners each realized capital gains in the amount his loan exceeded his basis in the stock." 59 T.C. at 812.

By arriving at its conclusion via this route, the Tax Court distinguished Turner v. Commissioner of Internal Revenue, 49 T.C. 356 (1968) aff'd per curiam, 410 F.2d 752 (6th Cir. 1969).

*Turner* seems to have been interpreted for the proposition that when a donor makes a "net gift" to a recipient and requires the donee to pay his gift tax liability, the payment of the donor's gift tax is not taxable as income to the donor. 49 T.C. at 363.[3] In *Turner*, the donor required the donee to pay his gift tax out of the gift's proceeds. In the instant case the Tax Court found that the transfers were not conditioned on the recipients' payment of gift taxes, that the donors reserved no interest in the trust corpora, and that the loans herein were not to be equated with the gift tax liabilities in *Turner* (since the loan proceeds significantly exceeded the gift taxes paid). The Tax Court concluded,

> "Finally, unlike in the *Turner* case, we have found, on the basis of all the facts presented and consonant with the authorities hereinbefore discussed, that the transfers here in question were in reality part sales and part gifts." 59 T.C. at 813.

Taxpayers concede on appeal that the *Crane* doctrine applies to the extent of $50,000 received through Dr. Johnson's transactions, but only to this extent. Asserting the familiar doctrine that "substance controls over form," they argue that their intent and the results of their transactions are identical to the *Turner* situation, so long as they concede that the $50,000 received in excess of gift tax liability minus the basis of the transferred shares should be taxed as a capital gain. Thus, they argue that the $150,000 which was received and used to pay the gift tax liability should escape income taxation.

Were we to view the *Turner* case in such broad terms as taxpayers assert, it would be difficult to distinguish this case from *Turner*. To be sure, the fac-

---

3. This conclusion has been reached by certain commentators, who see the tax-planning opportunity by this view of the *Turner* case. *See, e. g.,* Kopp, "Gifts Subject to Donee Payment of Tax: Timing, Risks and Computations," 27 N.Y.U.Inst.Fed.Tax, 275, 397 (1969). Other commentators have not viewed the *Turner* decision as standing for so broad a principle. *See, e. g.,* Lowenstein, "Federal Tax Implications of Gifts Net of Gift Tax," 50 Taxes 525 (1972). No difficulty of taxpayer reliance on *Turner* is involved herein, since the relevant events occurred four years before the *Turner* decision.

tors which the Tax Court found distinguishing are present. But to the extent the loan proceeds were used to pay the gift tax on the transfer, these features have little distinguishing force. Indeed, to state that in this case the transactions were "in reality part sales and part gifts" is to do nothing more than assert a conclusion. The fact is that these taxpayers, assisted by attentive tax counsel, attempted to raise cash to pay their gift taxes without themselves incurring taxable gain from transactions needed to raise the cash. This is what the *Turner* taxpayers attempted to do and succeeded in doing. In the murky tax-planning days of the early 1960's,[4] the *Turner* lawyers advised one procedure, and the lawyers in this case advised another. For the results to diverge diametrically, we should be forced to this conclusion by the words or policies of the Internal Revenue Code. Because of our approach to this problem, we avoid the need to consider maintaining a distinction in result based on minor variations in tax planning to similar ends.[5]

■ The substance of a transaction rather than its form must ultimately determine the tax liabilities of individuals. Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Foresun, Inc. v. Commissioner of Internal Revenue, 348 F.2d 1006, 1008 (6th Cir. 1965). When one overall transaction transferring property is carried out through a series of closely related steps, courts have looked to the essential nature of the transaction rather than to each separate step to determine tax consequences of the transfer. Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 99 F.2d 588 (6th Cir.), cert. denied, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); Kimbell-Diamond Milling Co. v. Commissioner of Internal Revenue, 14 T.C. 74 (1950), aff'd per curiam, 187 F. 2d 718 (5th Cir.), cert. denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951); American Potash & Chemical Corp. v. United States, 399 F.2d 194, 185 Ct.Cl. 161, pet. for rehearing, 402 F.2d 1000, 185 Ct.Cl. 161 (1968). The substance of the transactions in this case was a gift of $500,000 worth of stock in exchange for $200,000, $150,000 of which was used to pay the donor's gift taxes.[6]

---

4. For examples of the guesswork of planners in this area, at the time the *Turner* and Johnson transactions were being undertaken, 1960–61 and 1965, respectively, *contrast* Comment, "Income Tax Consequences of Gifts of Property Encumbered in Excess of Basis," 7 U.C.L.A.L.Rev. 770, 774 (1960), and Note, "Assumption of Indebtedness by a Donee—Income Tax Consequences," 17 Stan.L.Rev. 98, 105 (1964) *with* Palmer, "Tax Saving Through Charitable Giving," 36 Taxes 40 (1958), and Spears, "Mortgages in Excess of Basis," 1959 So.Cal.Tax Inst. 883, 902.

5. Minor variations in form may mean dramatically different results in proper cases. The "substance over form" argument is not a magic incantation which makes a transaction tax-exempt at a taxpayer's command (or taxable at the Commissioner's wish). For example, suppose the taxpayers here had chosen to sell their stock to the trust for $500,000, and had then given the trust $500,000, on the condition that the trust give them $50,000 and pay their gift taxes. Aside from tax events the identical result would be reached between donors and do-

nees. Yet, it would be a startling contention that the initial sale should escape taxation —and in a greater amount than imposed through Appellants' transactions. *See* Edmister v. Commissioner of Internal Revenue, 391 F.2d 584 (6th Cir. 1968); Montesi v. Commissioner of Internal Revenue, 340 F.2d 97 (6th Cir. 1965).

6. Taxpayers point out that the original assessment of Tennessee and federal gift taxes was $208,497.51, which exceeds the loan taken out by Dr. Johnson. They argue that this undermines the Tax Court's point that the $50,000 received over and above the eventual gift tax assessment indicates that taxpayers were "in reality" making a "part sale" of their stock rather than a "net gift." This entire semantic discussion is irrelevant under our analysis of the case.

Were we to adopt the Tax Court's reasoning that a "part sale, part gift" was involved in this case, we would be hard put to justify the Tax Court's "finding" to that end. In *Turner* the Tax Court held that in cases where donees are obligated to pay gift taxes, courts have "looked at the facts of each case, including the close family relationship

■ Whether we describe this substance as a "part sale and part gift" or a "net gift" has no importance. The fact is that each taxpayer received something of value upon transferring his encumbered stock into trust. Dr. Johnson received $200,000, free and clear of any obligation to repay that amount from any property in his possession. This amount constituted gross income in the year of receipt, under the broad definition set forth in section 61 of the Code —"all income from whatever source derived." It makes no difference to what use the $200,000 was put, whether to pay for food or to pay a gift tax.

The same result would be reached if we describe the $150,000 used to pay the gift taxes on the transfer into trust as equivalent to what happened in *Turner* (donees' assumption of donor's gift tax liability). If we view the $150,000 receipt as the payment of the donor's gift tax by the donee, then the donor has nonetheless realized income. The gift tax liability is the *donor's* legal obligation under section 2502(d) of the Code,[7] and "[t]he discharge by a third person of an obligation to him is equivalent to receipt by the person taxed." Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U.S. 716, 729, 49 S.Ct. 499, 504, 73 L.Ed. 918 (1929) (taxing as income employer's payment of employee's income taxes). *Accord,* Safe Harbor Water Power Corp. v. United States, 303 F.2d 928, 157 Ct.Cl. 912 (1962) (payment of income taxes);

Schaeffer v. Commissioner of Internal Revenue, 258 F.2d 861, 864 (6th Cir. 1958) (net increase in accrual basis taxpayer's reserve account with purchaser); Guarantee Title & Trust Co. v. Commissioner of Internal Revenue, 313 F.2d 225, 228 (6th Cir. 1963); Malone v. United States, 326 F.Supp. 106, 112 (N.D.Miss.1971), aff'd 455 F.2d 502 (5th Cir. 1972) (payment of mortgage). The payment of a donor's gift tax liability by the donee constitutes income to the donor.

We note that the identical conclusion would be mandated if we focus upon Dr. Johnson's shedding of the $200,000 debt by transferring the encumbered stock into the trust. Under Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), the taxpayer realized income in the amount or the debt disposed of, regardless of the fact that he was not personally liable on the debt.[8] We believe that the transactions in this case fall within the parameters of *Crane,* especially in view of the fact that the taxpayers actually received cash without liability to repay the notes out of their own assets. *See* First National Industries, Inc. v. Commissioner of Internal Revenue, 404 F.2d 1182 (6th Cir. 1968), cert. denied, 394 U.S. 1014, 89 S.Ct. 1633, 23 L.Ed.2d 41 (1969) (donor charged with capital gain upon the gift of property subject to a mortgage); Simon v. Commissioner of Internal Revenue, 285 F.2d 422 (3d Cir. 1960); O'Dell & Sons Co.,

involved, and have determined what was in fact intended by the parties." 49 T.C. at 362. It is difficult to find that the parties here actually intended a part sale, part gift, in view of the obvious tax implications of such an intention. It is better to apply the Tax Code equitably to basically similar transactions than to impose different results depending upon a hindsight determination of "actual intent."

7. The donee may eventually become liable for the gift tax if the donor fails to pay when the tax is due and the Internal Revenue Service chooses to hold the donee rather than the donor. Section 6324(b). Donee liability is, however, in the nature of a lien rather than an alternative source of person-

al liability at the taxpayers' option, at least before the tax is actually due and payable. See Estate of Sheaffer v. Commissioner of Internal Revenue, 313 F.2d 738, 741 (7th Cir. 1963).

8. There has been some question of whether the Supreme Court intended in *Crane* to establish the unwavering principle that the shedding of debt *per force* gives rise to taxable income. *See* Adams, "Exploring the Outer Boundaries of the Crane Doctrine; An Imaginary Supreme Court Opinion," 21 Tax L.Rev. 159 (1966); Parker v. Delaney, 186 F.2d 455, 459 (1st Cir. 1950) (Magruder, J., concurring), cert. denied, 341 U.S. 926, 71 S.Ct. 797, 95 L.Ed. 1357 (1951).

Inc. v. Commissioner of Internal Revenue, 169 F.2d 247 (3d Cir. 1948).

Taxpayers, on the other hand, cite no Code provision which exempts their receipt of $200,000 from taxation at the time of the transfers into trust. No "roll-over" provision exists to allow taxpayers to shift highly appreciated stock into a trust without incurring a capital gain tax on the amount realized by the donor through the donees' payment of the gift taxes. Congress has stringently limited the transactions which merit "roll-over" treatment (allowing a transfer of property without triggering a taxable event.) See sections 1031–1038, Int.Rev.Code of 1954. The transactions engaged in here are not among those exempted from tax.[9]

Thus, we find no basis whatsoever in the provisions of the Code for taxpayers' assertion that a donee's discharge of a donor's gift tax liability does not constitute the realization of income if a donor's tax attorneys structure the transactions in a certain manner. The donor must somehow obtain the cash necessary to pay his gift taxes. If he acquired the cash upon the transfer of the donated property, then he realized income, so long as the amount received exceeds his basis in the donated property. Section 1001(b). This is true whether we view the event triggering the realization of income as a sale or as the discharge of indebtedness or as something else. If, as the Tax Court held, the $200,000 in cash was received through a "sale" of the stock (the entire transaction constituting in part a sale and in part a gift), then the stock's disposition is included in gross income under section 61(a)'s general definition of income as well as the specific language of clause (3) ("gains derived from dealings in property"), the amount realized under section 1001(b) is $200,000 ("the sum of any money received [$200,000] plus the fair market value of the property (other than money) received [$0]") minus $10,000 basis, and the tax would be imposed at capital gains rates under section 1201(b) ("gain from the sale . . . of a capital asset held for more than 6 months" within section 1222(3)). If we view the transaction herein as a discharge of gift tax indebtedness occasioned by the donees' payment of the gift tax, as taxpayers contend, the $50,000 received in excess of gift taxes paid is taxable at capital gain rates (conceded by taxpayers and specifically taxable under section 61(a)(12) as "income from discharge of indebtedness," inter alia), the $150,000 which was received by the donor and used to pay his gift taxes is taxable under Old Colony Trust, as well as Crane, the amount realized is [$50,000 plus $150,000] minus [$10,000 basis] = $190,000 under § 1001(b), ("gain from the . . . other disposition of property"), and the tax is imposed at capital gains rates under § 1201(b) (gain from the . . . exchange of a capital asset held for more than six months"). We find it immaterial whether the transaction is found to be "part sale and part gift."[10] This suggestive but artificial language should not obscure the essence of the transaction in which the taxpayers engaged— the transfer of highly appreciated stock to a trust for their children's benefit, with the funds to pay their gift taxes raised out of the transferred property, plus additional cash. The effect of imposing a capital gain tax at the time of the stock's transfer is to collect the tax at that time, rather than to defer the tax until the trustees dispose of it through a taxable event. Since money can easily be obtained to pay the capital

9. The roll-over provisions present in Woodsam Associates, Inc. v. Commissioner of Internal Revenue, 198 F.2d 357 (2d Cir. 1952), took one transaction therein outside the Crane doctrine. While a gift is specifically excluded from a donee's taxable income, there is no authority that makes a gift transfer a non-taxable event as to the donor.

10. This language may be significant for determining the basis of donated property under the Income Tax Regulations, § 1.1015–4. But as discussed below, text at n. 12, the basis problem is easily solved without recourse to magic labels.

gains tax at the time of the transfer, we see no policy objection to imposing the tax at that time.[11]

In view of our holding, we are obligated to comment specifically on the major case on which Appellants rely—Turner v. Commissioner of Internal Revenue, 410 F.2d 752 (6th Cir. 1969), aff'g 49 T. C. 356 (1968). Taxpayers cite *Turner* for the proposition that a donor realizes no income when he makes a "net gift" and requires the donee to pay his gift taxes. The source of this asserted principle lies in a maze of cases wherein the Commissioner tested out § 677(a) of the Code, which imposes a tax *at ordinary income rates* upon amounts retained or received by a grantor upon transfer of property into trusts. *See* Estate of Staley, 47 B.T.A. 260 (1942), aff'd 136 F.2d 368 (5th Cir.), cert. denied, 320 U. S. 786, 64 S.Ct. 196, 88 L.Ed. 473 (1943); Estate of Sheaffer, 37 T.C. 99 (1961), aff'd, 313 F.2d 738 (8th Cir.), cert. denied, 375 U.S. 818, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963); Estate of Morgan, 37 T.C. 981 (1962), aff'd per curiam, 316 F.2d 238 (6th Cir.), cert. denied, 375 U.S. 825, 84 S.Ct. 68, 11 L.Ed. 2d 58 (1963); Estate of Sheaffer, 25 T.C.Mem. 646 (1966); Richard M. Turner, 49 T.C. 356 (1968), aff'd per curiam, 410 F.2d 752 (6th Cir. 1969); Victor W. Krause, 56 T.C. 1242 (1971), appeal dismissed (nolle pros), (6th Cir. June 27, 1972); Estate of Davis, 30 T. C.Mem. 1363 (1971), aff'd per curiam, 469 F.2d 694 (5th Cir. 1972). In none of these cases, however, did the Commissioner strongly argue, nor did the courts carefully consider, what the Commissioner argues here—that aside from section 677 certain amounts should be taxed. In fact, in *Turner* the Commissioner "conceded that the amounts paid by the trustees to the doner (*sic*) were not taxable to her. . . ." 410 F.2d at 753.

In addition, the Tax Court was concerned that the Commissioner's "part sale and part gift" contention would lead to a doubling of credit for the gift tax paid in the donees' basis, under Section 1.1015–4, Income Tax Regs. 49 T.C. at 363–364. This concern was without justification, as analysis of the facts in this case demonstrates. Under that regulation, assuming it is relevant (rather than § 1.1015–2,)[12] the donee's basis would be $200,000 (the "amount paid by the transferee for the property") plus $150,000 (gift tax paid), but limited to the fair market value of the gift (approximately $300,000 here). There is actually no "double credit" involved. The $150,000 received by the donor which was used to pay his gift tax is included as an increase to the donee's basis because the donor will have paid a capital gain on that amount of appreciation of his stock and that portion of the stock's increase in value should not again be taxed. The $150,000 increase in the donee's basis which is attributable to gift taxes paid by the donor is independently proper. Its function, separate from that of the other $150,000 increase, is not to discourage gifts. Were basis not raised by the amount of gift taxes paid, a donor would recognize that a shift of resources to the donees would incur a tax without a corresponding adjustment in basis for the donees. Thus, Congress has authorized increases in a donee's basis both by amounts of gain recognized upon trans-

11. Indeed, in this case, the "extra" $50,000 retained by each taxpayer over and above his gift taxes is approximately the amount of capital gains tax assessed. The donor who chooses to require the donees to pay his gift tax could simply require the donee to pay his recognized capital gain tax as well, though this might lead to further difficulties. *See* Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929); Safe

Harbor Water Power Corp. v. United States, 303 F.2d 928, 157 Ct.Cl. 912 (1962).

12. Since the gifts in this case were "transfers in trust," § 1.1015–2 would seem applicable. Section 1.1015–4 was designed to deal with problems peculiar to "part sale and part gift" situations in the nature of true "bargain sales." Section 1015 itself was a response to the bargain sale problem. See Farid-es-Sultaneh v. Commissioner of Internal Revenue, 160 F.2d 812 (2d Cir. 1947).

fers to trusts and by amounts of gift taxes paid, regardless of the fact that such amounts may superficially appear redundant.[13] *See* section 1015(b), (d); § 1.1015–2, –4, –5, Income Tax Regs.

Thus, the *Turner* case does not support the taxpayers' position. *Turner* has no precedential value beyond its peculiar fact situation, in view of the Commissioner's concessions in that case both in the Tax Court and on appeal to this Court.

We conclude that the deficiencies assessed by the Commissioner must be allowed, for the reasons stated in this opinion. On this basis, the decision of the Tax Court is affirmed.

13. The provision allowing an increase of the donee's basis in donated property by the amount of gift taxes paid was added in 1958. The Senate Report recommending the change stated that the absence of such a provision ignored a "cost" of making a gift —the cost of the gift tax. "As a result, [the] committee has concluded that to properly reflect total 'costs' incurred with respect to donated property, it is necessary to increase the basis of the property by the amount of any gift tax paid with respect to it. . . . However, the basis of the prop-

erty as a result of this addition of the gift tax to the basis is not to be increased to more than the fair market value of the property at the time of the gift. A limitation of this type means that cash will be treated no less favorably than other property, and that there will be no incentive to convert cash into securities in order to obtain an increase in basis above the fair market value of the property." Sen.Rept.No. 1983, 85th Cong., 2d Sess., U.S.Code Cong. & Admin.News, pp. 4859–60 (1958).